**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×

NANHUA JIN,

                              *Plaintiff,*                                      **24-CV-10047**

               v.

DATADOG, INC., JAMES KRIEGER, TRISTAN                          **COMPLAINT**
RATCHFORD, REID HORTON, MUHAN GUCLU, and
FABIEN HERVE,                                                                  **JURY TRIAL DEMANDED**

                              *Defendants.*
------------------------------------------------------------------------×

       Plaintiff, Nanhua Jin, by his attorneys, Young & Ma LLP, complains of Defendants as

follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Nanhua Jin ("Plaintiff" or "Mr. Jin") seeks damages and costs against Datadog,

Inc. ("Datadog" or the "Company"), James Krieger ("James"), Tristan Ratchford ("Tristan"), Reid

Horton ("Reid"), Muhan Guclu ("Muhan"), and Fabien Herve ("Fabien") (collectively,

"Defendants") for discriminating and retaliating against him based on race and disability;

perpetuating pervasive race and disability stereotypes; failure to provide accommodations; and

retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42

U.S.C. §2000e *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*;

the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## JURISDICTION AND VENUE

2.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as

Defendants violated Plaintiff's rights under Title VII and ADA.

1

3.      Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about August 27, 2024.

4.      Plaintiff requested a right to sue from the EEOC on or about October 2, 2024.  The EEOC issued the right to sue on or about October 3, 2024, and Plaintiff received it sometime thereafter.

5.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims as they are so related to the Title VII and ADA claims that they form part of the same case or controversy.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

**PARTIES**

7.      Plaintiff, at all times relevant hereto, was and is a resident of New York County in the State of New York.

8.      Upon information and belief, at all times relevant hereto, Defendant Datadog, Inc. was and is a U.S. corporation incorporated in Delaware and headquartered in New York City.

9.      Upon information and belief, Defendant James Krieger is an individual residing in New York and works in New York for Datadog.

10.     Upon information and belief, Defendant James Krieger is an individual residing in New York and works in New York for Datadog.

11.     Upon information and belief, Defendant Tristan Ratchford is an individual residing in New York and works in New York for Datadog.

12.     Upon information and belief, Defendant Reid Horton is an individual residing in New York and works in New York for Datadog.

2

13.    Upon information and belief, Defendant Muhan Guclu is an individual residing in New York and works in New York for Datadog.

14.    Upon information and belief, Defendant Fabien Herve is an individual residing in New York and works in New York for Datadog.

## STATEMENT OF FACTS

15.    Datadog provides an observability service for cloud-scale applications, providing monitoring of servers, databases, tools, and services, through a SaaS-based data analytics platform. Founded and headquartered in New York City, the company is publicly traded on the Nasdaq stock exchange and has a market cap of over $37 billion.

16.    Mr. Jin was a software engineer for over a decade at Epic Systems, Microsoft, and Dataminr. He has a BS in computer science from Vanderbilt University and is a MS candidate. When Datadog pitched him to be a Senior Software Engineer, Chat Integrations, Mr. Jin had capacity in Cassandra and PostgreSQL; and expanded in Golang and Python.  He contributed in mentorship, code review, and driving direction; and implemented link unfurling and mute monitor features.

17.    It was a steal to hire Mr. Jin at $215,000 annual compensation and to require that he relocate.  Plaintiff is also not the first Asian American from the West Coast that the Company callously recruited, relocated, and then the employment did not work out in relatively short time.

18.    Mr. Jin kept detailed logs of projects and status and was generally very organized.  He was hired for his technical capacity.

19.    In short time, Mr. Jin was able to help unblock roadblocks with employees and their development (i.e., specifically helping Jackie Lincroft with front end debugging or the new bot API framework in MS Teams integration), research (how Incident App was pulling Slack images

for user profiles or not), and deliver and finish tasks assigned regardless of difficulty.  In Plaintiff's 30, 60, and 90 day plans, he had all tasks completed.  Mr. Jin released the dashboard link unfurling project end to end, provided relevant comments on pull requests from other team members, served as an expert for updating the Microsoft Teams manifest file on the team (Incident App people asked Plaintiff questions), and finished Incident training within the first two months, which was faster than other new hires.

20.    At hire, the Company refused to assign Mr. Jin to an Asian female manager, Wendy Jiang, who had a diverse team and also had a project match (Greenfield).  Instead, he was assigned to benefit a White male manager, Tristan Ratchford, who had no overlap with Plaintiff's work or Greenfield but had two newer engineers that needed technical direction.  Tristan's team was mostly or all White and operated in a clique unlikely to accept direction or input from a minority male with a disability (further described below).  Mr. Jin had experience previously on Microsoft for the Microsoft Teams work and was developing in a new city in Golang and Python, which truly for his contribution/professional development, he was a better match to Wendy's team.

21.    Quite immediately during interviews, James Krieger (White male) said the Company wanted in person presence and not remote work, even knowing there may be a culture clash and the teams may not accept Mr. Jin long term (not even a year).  It was prejudicial as they did not want to give Plaintiff independence as an Asian male and wanted his physical presence to add to everyone else at will instead of provide him the resources to succeed based on his technical and managerial capacities.  Other similarly situated and also lesser qualified/able to be independent White males like Max Andaker and Dan Hodge were allowed to work remotely.

22.    Shortly upon commencing Mr. Jin's employment, Tristan (White male) gave him a very hard time on his team.  Projects were not aligned to Plaintiff's specialty and they expected deep

long hours the second day after his arrival to New York. Mr. Jin quickly looked two bugs in Microsoft around Christmas and New Year's, only starting employment December 11. He finished one bug regardless as it was an issue with Microsoft and not the team's code. The second project was very hard. Slack gives a retry time when the rate limit error is hit but Microsoft Teams does not so Plaintiff had to come up with formula and do testing in a language and framework he was not familiar with and his team also could not do it before his arrival. This was a typical situation of hiring an Asian technical male to fix problems on a White team, treating a senior engineer essentially as an IT personnel. Mr. Jin was asked to add feature flag and constantly cross examined whether it would work and yet the team did not fix it themselves before he came. Plaintiff had also not known of these projects in interviews and it was not the focal point, nor did he represent he could find a solution and yet he resolved one bug very quickly.

23.     Reid Horton (White male) was preferred in Mr. Jin's team. The whole team sat facing Plaintiff in an uncomfortable way so he was opposite Tristan, Reid, Anna Westland-Tegart, and Jackie Lincroft. He also sat next to his Director James Krieger, which made it awkward to ask any questions (as the teammates were already up to speed) and it was hard to talk to Tristan. The positioning was also near a window with glare and Mr. Jin had to roll down windows to prevent affecting his work as he has diplopia/double vision, which was consistently made known to his team and was visible as he had accessories for this disability. Anna and Jackie would get snacks together and sometimes Reid and Tristan went with them while Plaintiff was excluded. He was not made part of their Slack or Incident App communications until he pushed. One time they decided to move the whole team to work in the cafeteria and Mr. Jin wasn't even informed around the end of January. He reported this to Muhan (the manager above Plaintiff's manager) relatively soon thereafter and nothing was done to make a more inclusive environment.

24.     Also in January, Mr. Jin was told about providing stronger supervision to Anna and Jackie. However, as noted, they were not open to receiving feedback or involvement from him and actively excluded him.  Plaintiff reached out to Jackie many times but both women were only willing to talk to Reid.  In fact, that is what Reid preferred and was the environment before Mr. Jin joined. Around this time, James Krieger was also already saying there are issues in the employment relationship, which is entirely based on personality/race and disability stereotypes.  The team had no intention of investing in Plaintiff and both callously hired him and completely bypassed and ignored attempting to integrate him.

25.     Mr. Jin only had access to Muhan, his assigned boss, on January 25 after Tristan and James basically made up their minds about him.  To further seal the eventuality of termination, Muhan immediately said he wanted Reid to be the "technical anchor" and Reid had absolutely no incentive to help Plaintiff's employment work out.  Mr. Jin offered to be an anchor but was refused even if he had better technical knowledge and experience.  The team was constantly interrupting him on administrative and duties outside Plaintiff's job description, such as call issues for the team, answering support tickets, documenting all the services in the team, and creating dashboard of all team's services.  Mr. Jin had reported directly to Muhan issues like the whole team moves to cafeteria and while Plaintiff will try to pick up when Tristan is not around, the team has to minimally respect and work with him for him to productively contribute.  Mr. Jin's bosses also admitted there was no time for 30-60-90 rotation to integrate and needed to put him straight on projects.  They demanded that Plaintiff be the only on-call engineer.  Mr. Jin had to get link unfurling delivered and do on call rotation.  He finished on call training, supported admin training and ITAR compliance training and looked at on-call issues that were paged to the team.  Plaintiff worked to deliver link unfurling, which was more challenging than his and management's

expectation. He had to rewrite system architecture and reply back to messages as opposed to sending an endpoint of what the team's response is. In mid-February, the team did not look at Mr. Jin's 30-60-90 review and treated him with complete neglect.

26. Then the team had a move upstairs where Tristan, Jackie, Anna, and Reid all sat in one line, excluding Mr. Jin. Reid did not enjoy talking to him and conversation was awkward. Reid had so much discriminatory and stereotyped feelings about Plaintiff that he actually reported Mr. Jin for "asking too many questions" when he was desperately making small talk only to fit in to survive, as it was clear a new employee cannot survive without fitting into the all-White clique. Plaintiff stated to Muhan that he was ready for on call rotation and did training but then unlike anyone else, Mr. Jin was given a quiz about Delancy dependency service, which doesn't seem related and how that played into on call. Based on this alone, it was decided Plaintiff can't do it, which was just pretextual as they did not want to include him.

27. On Saturday February 24, Reid was going to be out and could not do his responsibilities and so there was reason to utilize Mr. Jin, who they generally wanted to exclude. Plaintiff said he can look at any issues as first response. However, Anna responded that she will replace Reid and also Mr. Jin was told not to do this work in the past. It was completely disrespectful as Anna is junior to him and no one called him then to explain why he wasn't right for offering himself. For this, Mr. Jin was placed on a PIP saying he should have put his name on the call schedule to avoid paging everyone but no one respected him so Plaintiff wanted to make clear. It was a classic example of minimizing an Asian male for being too quiet and then admonishing him if he was assertive. The end of February PIP was also pretextual because, once again in a manner exclusive only to Mr. Jin, the team decided that deploying on a Thursday before a long weekend was an issue. Reid has done code change productions late into Friday afternoons without an issue. Jessie

Gibson and Reid actually both asked Plaintiff to deploy on that Thursday before the long weekend. The git was in his branch and there was no impact on production service. Mr. Jin was ready for on call and managers were not trusting him when testing on concepts not in learning documents. He set up a PIP tracker to document week to week progress and but no one truly cared to work with him.

28. Mr. Jin made it well known right at the start of employment that he has diplopia/double vision. Plaintiff needed special configurations desk and dealt with persistent headaches. He needed time for projects and low anxiety and no bullying to function well. He could not succeed with his disabilities in the stereotypes that existed in his department. Mr. Jin needed breaks for eye exercises with special glasses. James saw hidden pictures papers on Plaintiff's desk and asked about it in December and it was discussed generally with the whole team. He even said his kid "likes" it and Mr. Jin corrected that it was for Diplopia and not a preference. James acted like Plaintiff was working on a distraction at work. Tristan also asked about it and Mr. Jin said it was for Diplopia. Therefore, Plaintiff's managers were well aware of his needs and both discriminated and did not accommodate him.

29. On March 21, Mr. Jin applied for short and long term disability, which was well known to Tristan, Muhan, Reid, and James. Even if the application was rejected, the Company was well aware in writing of Plaintiff's mental and physical needs during this period. Even in the April 26 termination letter, Datadog acknowledged he applied for STD and therefore knew he needed accommodations. Even if STD is denied, the Company had obligations to both provide the leave in another way and also to provide accommodations, which certainly would include not terminating during the period Plaintiff had medical needs. Once again, such despicable callous and illegal handling can only happen to a "quiet" Asian male with a disability.

8

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Race Discrimination and Hostile Work Environment**
**in Violation of Title VII**
**(Against Defendant Datadog)**

30.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

31.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) et seq., for relief based upon the unlawful employment practices of Defendant Datadog.

32.    Datadog was Plaintiff's "employer" within the meaning of Title VII.

33.    Plaintiff was an Asian "employee" of Datadog and is a member of protected classes within the meaning of Title VII.

34.    At all relevant times, the Company was aware of Plaintiff's race.

35.    By the conduct alleged in this Complaint, Datadog discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of his employment because of his race.

36.    Plaintiff was subjected to a pervasive hostile work environment by the Defendant's conduct.

37.    The Company engaged in unlawful employment practices prohibited by Title VII because of Plaintiff's race in the manner described in the Statement of Facts.

38.     Plaintiff suffered adverse employment actions and continuing damage by the Defendant due to his race and the hostile work environment that Plaintiff suffered at Datadog because of his race.

9

39.    As a direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continues to suffer the loss of income and damage to reputation.  Plaintiff has also suffered and/or will suffer future pecuniary losses, attorney's fees and costs, emotional and physical pain and suffering, inconvenience and other non-pecuniary losses.

40.    As a further direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continue to suffer, among other things, impairment and damage to his good name and reputation, emotional distress, physical injury, mental anguish and lasting embarrassment and humiliation.

41.    Plaintiff is entitled to recover, inter alia, monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from Datadog under Title VII.

**SECOND CAUSE OF ACTION**
**Disability Discrimination in Violation of**
**the Americans with Disabilities Act**
**(Against Defendant Datadog)**

42.    At all relevant times, Plaintiff was an "employee" of Datadog under the ADA, 42 U.S.C. § 12111(4).

43.    Defendant Datadog is an "employer" under the ADA, 42 U.S.C. § 12111(5).

44.    Defendant Datadog violated the ADA by discriminating against Plaintiff based on his disabilities in connection with employment determinations including, inter alia, pay, promotion, job assignments, training, leave, benefits, and other employment related activities.

45.    Plaintiff suffers from protected disabilities under the ADA, which he made known to his employer Datadog.

46.    Plaintiff's disability was used by the Company, wrongfully and without basis, to deny Plaintiff the pay, privileges, and other benefits to which he was rightfully entitled by, inter

alia, limiting, segregating, or classifying Plaintiff in a way that adversely affects the opportunities or status of Plaintiff because of his disability.

47.     In fact, the Company judged Plaintiff's disability and made him uncomfortable and in ways that were detrimental to his health and safety and career progress.

48.     The Company's discrimination against Plaintiff based on his disability and/or perceived disability was intentional and willful.

49.     By reason of the foregoing, Plaintiff is entitled to recover, inter alia, monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from Datadog.

**THIRD CAUSE OF ACTION**
**Race and Disability Discrimination and Hostile Work Environment**
**in Violation of NYSHRL**
**(Against All Defendants)**

50.     Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

51.     This Count is brought under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq., and reference is made to the NYSHRL in its entirety.

52.     At all relevant times, the Company was Plaintiff's "employer" within the meaning of the NYSHRL.

53.     At all relevant times, Plaintiff was an "employee" of Datadog within the meaning of the NYSHRL.

54.     At all times, Defendants were aware of Plaintiff's race and disability.

55.     Defendants engaged in unlawful employment practices prohibited by the NYSHRL because of Plaintiff's race and disability in the manner described in the Statement of Facts.

11

56.    Plaintiff is severely limited in his career by Defendants' unlawful conduct due to his race and disability.

57.    Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination on the basis of race and disability as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to do so, in violation of the NYSHRL.

58.    Defendants are also individually and jointly liable for the unlawful conduct herein, including, without limitation, as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL.

59.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

60.    Plaintiff's damages include, inter alia, financial loss, loss of employment opportunities, damage to his career and professional reputation, and severe emotional distress caused by the degrading conduct and loss of employment opportunities.

61.    Plaintiff is entitled to recover monetary damages and other damages and relief, including, but not limited to, back pay, front pay, compensatory and punitive damages, and costs and attorney's fees from Defendants under the NYSHRL.

**FOURTH CAUSE OF ACTION**
**Race and Disability Discrimination and Hostile Work Environment**
**in Violation of NYCHRL**
**(Against All Defendants)**

62.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

12

63.    This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq., and reference is made to the NYCHRL in its entirety.

64.    At all relevant times, Defendants were an employer and person within the meaning of the NYCHRL.

65.    At all relevant times, Plaintiff was an employee and person within the meaning of the NYCHRL.

66.    At all times, Defendants were aware of Plaintiff's race and disability.

67.    Defendants engaged in unlawful employment practices prohibited by NYCHRL because of Plaintiff's race and disability in the manner described in the Statement of Facts.

68.    Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled and/or coerced the unlawful conduct alleged herein, or attempted to do so, in violation of the NYCHRL.

69.    Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected rights to be free from discrimination and a hostile work environment.

70.    Defendants are individually and jointly liable for the unlawful conduct herein, including without limitation as an "employer" and "employee" under the NYCHRL and under the "aiding and abetting" provision of the NYCHRL.

71.    As a direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continues to suffer injury, with resulting monetary, economic and other damages, including without limitation, lost wages, lost back pay, lost benefits, lost bonuses, interest on the foregoing, and attorney's fees and costs.

72.    As a further direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continues to suffer, among other items, impairment and damage to his

good name and reputation, emotional distress, mental anguish, emotional and physical pain and suffering, and lasting embarrassment and humiliation.

73.    Plaintiff is entitled to recover monetary damages and other damages and relief, including compensatory and punitive damages, interest, and attorney's fees and costs from Defendants under the NYCHRL.

**FIFTH CAUSE OF ACTION**
**Retaliation in Violation of Title VII**
**(Against Defendant Datadog)**
**and the NYSHRL and NYCHRL**
**(Against All Defendants)**

74.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

75.    Defendant Datadog violated Title VII, and all Defendants violated the NYSHRL and NYCHRL, because they knowingly retaliated against Plaintiff for objecting to the discrimination at Datadog, as alleged in the Statement of Facts above.

76.    Defendants were aware that Plaintiff engaged in the protected activities alleged above.

77.    Because of his protected activities, Defendants took retaliatory adverse employment actions against Plaintiff as alleged in the Statement of Facts above.

78.    The unlawful retaliation against Plaintiff by Defendants was done with malice and reckless indifference to Plaintiff's protected rights.

79.    As a direct and proximate result of the unlawful retaliation by Defendants, Plaintiff has suffered damage to his career path, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life and damage to his reputation and career.

14

**SIXTH CAUSE OF ACTION**
**Failure to Provide Reasonable Accommodation**
**in Violation of ADA (against Defendant Datadog)**
**and NYSHRL and NYCHRL (against All Defendants)**

80.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

81.    The ADA, NYSHRL, and NYCHRL require Defendants to engage in a mandatory interactive process and cooperative dialogue to identify a reasonable accommodation for an employee with a disability.

82.    Defendants failed to provide a reasonable accommodation for Plaintiff's disability by refusing to engage in the mandatory interactive process and cooperative dialogue in good faith to identify a reasonable accommodation for his disabilities.

83.    As such, Defendant Datadog has violated the ADA, and all Defendants have violated the NYSHRL and NYCHRL.

84.    Additionally, Defendants failed to engage in a cooperative dialogue pursuant to the October 15, 2018 changes to NYCHRL after obtaining multiple notices of Plaintiff's medical needs, and failed to provide a credible written explanation as to why accommodations were not possible for Defendants.

85.    Defendants' termination of Plaintiff and refusal to make reasonable accommodation for Plaintiff on the basis of his disabilities constituted unlawful discrimination in violation of § 8-502 of the NYCHRL.

86.    As a direct and proximate consequence of Defendants' discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, economic loss and emotional distress, all in amounts to be determined at trial.

87.     Plaintiff is entitled to recover monetary damages and other damages and relief, including punitive damages, interest, back pay, front pay, emotional distress damages, reasonable attorney's fees and compensatory damages from Defendants under the NYCHRL.

**JURY DEMAND**

88.     Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands a judgment against Defendants as follows:

A.     Issue a declaratory judgment declaring that the actions of the Defendants, as set forth in this Complaint, violated:  (i) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (ii) the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; (iii) the New York State Human Rights Law, N.Y. Exec. Law. § 290 *et seq.*; (iv) the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*; and (v) that Defendants' foregoing acts of discrimination, harassment, and retaliation against Plaintiff were intentional and willful.

B.     Enjoin and restrain the Defendants and all persons acting on their behalf, or in concert with them, from engaging in such unlawful discriminatory and retaliatory practices;

C.     Enter judgment in favor of the Plaintiff, and against the Defendants, for back pay, front pay, and lost benefits, including, among other things, in the amount of the wages and bonuses it is determined that the Plaintiff lost as a result of the Defendants' unlawful, discriminatory and retaliatory conduct, together with interest;

D.     Enter judgment in favor of the Plaintiff, and against the Defendants for compensatory damages, including but not limited to, damages for Plaintiff's mental anguish, humiliation, lack of self-respect, emotional and physical pain, suffering and illness, together with interest;

16

E.      Award the Plaintiff punitive damages;

F.      Award the Plaintiff liquidated damages;

G.      Award the Plaintiff reasonable attorney's fees, interest, and expenses together with the costs of this action;

H.      Award such other and further legal and equitable relief as may be appropriate to redress fully the deprivation of the Plaintiff's rights under the laws cited herein, to prevent their recurrence in the future and to protect other employees from such unlawful behavior; and

I.      Such other and further relief as the court deems appropriate to be determined at trial.

Dated: New York, New York
          December 31, 2024

                                            Respectfully submitted,


                                  By: _____
                                            Tiffany Ma, Esq.
                                            Young & Ma LLP
                                            445 Park Avenue, 9th Floor
                                            New York, NY 10022
                                            T: 646-379-7703
                                            F: 866-839-4306
                                            tma@youngandma.com